JUDGE STEIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

08 CIV 7333

---------------------------------------------------------------- x

DONALD BERNHARDT,

                Plaintiff

-against-

TRADITION NORTH AMERICA and
TRADITION ASIEL SECURITIES, INC.

                Defendants.

---------------------------------------------------------------- x

Index No.:

COMPLAINT

RECEIVED
AUG 1 9 2008
U.S.D.C. S.D.N.Y.
CASHIERS

    Plaintiff, Donald Bernhardt, by and through his attorneys, Joseph & Herzfeld LLP, alleges upon knowledge as to himself and upon information and belief as to all other matters as follows:

### NATURE OF CLAIM

1. This action is brought to remedy a breach of contract.

### JURISDICTION, VENUE, AND PARTIES

2. Defendants in the case are the Delaware corporations Tradition North America, Inc. ("Tradition NA") and Tradition Asiel Securities ("Asiel"), together referred to as "Defendants."

3. Tradition NA, is a brokerage firm whose principal place of business is located at 75 Park Place New York, NY 10007.

4. Tradition NA's registered agent is CT Corporation System, 111 Eighth Avenue, New York, New York 10011

5. Asiel is a wholly owned subsidiary of Tradition NA.

6. Asiel is a broker dealer registered with the Securities Exchange Commission.

7. Asiel's principal place of business is 61 Broadway, 4th Floor, New York, New York 10006

8. The CEO of both Tradition NA and Asiel is Emil Assentato.

9. At all times relevant, the Plaintiff, Donald Bernhardt was employed by Tradition NA at its office located at 75 Park Place New York, NY 10007.

10. Plaintiff resides at 44 Salem Lane, Little Silver, NJ 07739.

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332; the Defendants' principle place of business is in New York and Defendants are doing business in this jurisdiction; The Plaintiff lives in New Jersey and the amount in question exceeds $75,000.

12. Venue is proper in that Defendant is located in New York County, the relevant events took place in New York County, and relevant witnesses and evidence are located in New York County.

## FACTS

13. On or around December 1996, Plaintiff commenced employment with Tradition NA as a money market securities broker at its New York headquarters.

14. Plaintiff was an exemplary employee and was never the subject of disciplinary action prior to the events giving rise to this claim.

15. Plaintiff was promoted to Vice President of Tradition NA on or around May 15, 1999.

16. In 2001, Plaintiff realized that under the tutelage of Desk Manager and Senior Vice President Steve Marrano, Defendants were engaging in elaborate illegal securities schemes involving buy-backs, parking, and artificial pricing, in violation of United States Securities laws. (Section 10(b) of the Securities Exchange Act; Rule 10b-5; (Intentional Fraud; "fraud on the market"); SEC Rule X-10B-5 (Deception by Directors); and Sections 17(a); 9(a); 10(b); and 15(c).

17. Tradition NA/Asiel's brokers solicited banks to participate in artificial buy-back/parking transactions and shared the money generated from such illegal trades. In each of many instances, a broker of Tradition NA/Asiel would come up with a scheme and present it to a bank, in which a bank such as (Svenska Handels Bank NY) would issue a floating-rate CD to a broker-dealer such as Merrill Lynch (Merrill Lynch is not a party to the fraud and was unaware of

these illegal deals) who Defendants' knew would sell it immediately back to Tradition Asiel to hide that the end buyer of the securities was in fact Svenska Handels Bank NY, the original issuer. The illegality occurred when Defendants created a fraudulent trade known as a "Wash Sale" or Buy back. These Buy backs of the security were at a predetermined artificially low price. This artificially low price defrauded investors, traders and Risk Managers tracking the bank's security. The brokers under Steve Marano were told to remain quiet about these "Illegal Trades"

18. The compliance department at Tradition NA/Asiel discovered these illegal transactions and warned Steve Marrano and the brokers to stop this practice, but instead, they created a way to hide it from compliance by having another bank hold the security for one to two weeks at a very high rate and then have the issuing bank buy back the security after that short parking period.

19. Tradition and the issuing bank would split the massive proceeds generated from these illegal trades, which were sometimes as much as $750,000 each.

20. These illegal transactions defraud the market by creating an artificial last trade price, which is used by traders to analyze where securities of that credit last traded. Investors would be deceived into purchasing the issuing bank's security at an inflated price, thinking they were getting a deal based on the last reported transaction on Bloomberg League Table, not knowing that it was a fraudulent, artificial transaction in which the bank was both the issuer and the purchaser of its own security.

21. Defendants tried to pressure Plaintiff to participate in these illegal securities transactions by asking him over fifty times to get his clients to park securities, and promising him a "very good yield," informing him that a single buy-back would net the brokers involved approximately $300,000, which is equivalent to half a year's business for most brokers.

22. Plaintiff adamantly refused to be involved. On several occasions, he made it clear to his supervisors and co-workers that these transactions were fraudulent.

23. Management and co-workers displayed open hostility toward Plaintiff for his stance on the illegal transactions, and began retaliating against Plaintiff for his refusal to participate in these schemes. Plaintiff was repeatedly told that only those who participated in these trades were considered "part of the team."

24. Management systematically withheld distributions of accounts to Plaintiff, which negatively impacted his income. These accounts went mostly to the brokers who were the architects of the fraudulent buy backs and parking schemes.

25. On or around November 15, 2007, a photo copy of a bullseye was placed on Plaintiff's desk that scared Mr. Bernhardt and forced him to seek help from the Human Resources. Mr. Bernhardt's colleague told him that a few months prior someone had left a picture portraying a man with a pencil through his head, but the colleague felt sorry for Mr. Bernhardt and threw it out. Plaintiff notified Human Resources of both matters, along with a copy of the bulls-eye that had a computer generated number on the bottom that would be easy to track and asked for an investigation to be performed. Three days later, Plaintiff followed up with Human Resources to check on the status of the investigation, and they claimed to have forgotten about it, and a few days later said they could not find who had committed this act of psychological terrorism to Mr. Bernhardt and dismissed the incidents. Mr. Bernhardt could not stand the threats and threats of physical harm and went to the Securities and Exchange Commission the next day.

26. On or around November 27, 2007, Mr. Bernhardt notified the SEC that Defendants had engaged in improper "Wash Sales" "Buy Backs" and "Buy Back/Parking" of securities. For the next three months, hostilities steadily increased as more brokers in the firm participated in the dealings and Mr. Bernhardt withstood pressure.

27. On March 5, 2008, fearing for his and his family's safety, Mr. Bernhardt notified Mr. Marrano, as well as Defendants' Legal and Compliance Departments, that he had reported the illegal activity to the SEC.

28. Two days later, on March 7, 2008, Plaintiff was called into a meeting led by Mr. Marrano, who told him that he was being suspended for allegedly disclosing some unspecified information of a proprietary nature to an unnamed client. Plaintiff was stripped of his company ID and door pass.

29. Plaintiff informed those present at the meeting that this termination was illegal retaliation for reporting securities law violations to the Securities Exchange Commission and that the person running the meeting was the Principal on the desk and in full knowledge of the violations of Federal Securities Laws. The Plaintiff was asked to leave the building immediately.

30. Two weeks later, Plaintiff spoke with Chaim Levin, Lead Counsel at Tradition, to be updated on the status of his employment. He was told that he should obtain an attorney and that his "future employability is at risk."

31. On April 14, 2008, Plaintiff met with Mr. Levin at Tradition headquarters. Mr. Levin asked Plaintiff, "How do you know that fraud was committed?" Plaintiff replied that he was "positive that fraud had been committed" and began to explain how it had occurred. Mr. Levin interrupted, refusing to allow Plaintiff to explain, and quickly aborted the meeting in a fit of rage. Plaintiff expressed to Mr. Levin that he wished to continue the interview. However, Mr. Levin refused to hear any more about the fraud and told Plaintiff to leave. Plaintiff's attorney immediately sent a letter memorializing this perplexing meeting and expressing Plaintiff's interest in continuing the interview.

32. That afternoon, Defendant terminated the Plaintiff via email.

## FIRST CAUSE OF ACTION
### Breach of Contract

33. Repeats and realleges paragraphs 1 through 31, with the same cause and effect as if set forth in full herein.

34. An implied contract for employment was formed between Plaintiff and Defendants, which was based on the essential provision that Defendants would operate the firm, and that Plaintiff would be permitted to perform his job responsibilities, in accordance with the prevailing laws, rules and regulations of the securities profession.

35. Defendants breached the contract by failing to operate the firm in accordance with the laws governing the securities industry, pressuring the Plaintiff to violate the law, punishing him for his refusal to do so, and ultimately firing him for reporting the fraud and improprieties to the Securities Exchange Commission.

36. Plaintiff had a right to comply with securities law, by refusing to participate in the illegal buy-backs and parking schemes, in the performance of his job duties.

37. In November 2007, Plaintiff reported Defendants' violations to the Securities Exchange Commission.

38. For the next several months, Defendants continued to pressure the Plaintiff to get his clients to buy securities for the parking period, which Plaintiff refused to do and openly opposed.

39. On March 5, 2008, Plaintiff notified the legal compliance department that he had informed the SEC of the improprieties on the desk.

40. Two days later, Plaintiff was called into a meeting, accused of passing unspecified "proprietary information" to an unnamed client, and stripped of his employee card and key, and told to leave the building immediately.

41. Defendants terminated Plaintiff by reason of his attempts to stop violations of securities laws.

42. Defendants' actions described above constitute a breach of Defendants' contractual obligations to Plaintiff.

43. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but in any event, no less than $5,000,000.

## Punitive Damages

44. Repeats and realleges paragraphs 1 through 43, with the same cause and effect as if set forth in full herein.

45. Defendants violated securities laws and regulations prohibiting trading-based market manipulations schemes involving "Wash Sales" (buy backs) and matched orders. Such transactions are essentially prearranged deals that result in no change of ownership and create false impressions of active bank issues. Defendants arranged deals with banks at prearranged artificially low interest rates vs. LIBOR (London inter bank offered rate) thus trading produced fraudulent last trading prices. This defrauded investors and risk managers as to the true price of banks' credit-worthiness. With the resulting sub-prime crisis, it is imperative that banks show honest trading. Therefore, the public interest requires the imposition of punitive damages upon Defendants under the above facts and circumstances.

46. Only the imposition of significant punitive damages will encourage Defendants and others not to terminate employees who report egregious violations of United States securities laws and regulations of the Securities and Exchange Commission and the New York Stock Exchange.

47. Under such circumstances, an appropriate punitive damages award against Defendants will be determined at trial, but in any event, not less than $20,000,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.  An award of damages, according to proof, to be paid by Defendants;

B.  Costs of action incurred herein, including expert fees;

C.  Attorneys' fees;

D.  Pre-Judgment and post-judgment interest, as provided by law;

E.  Punitive damages; and

F.  Such other and further legal and equitable relief as this Court deems necessary, just and proper.

Dated: New York, New York
August 15, 2008

Respectfully submitted,

JOSEPH & HERZFELD LLP

By: *[signature]*
Charles Joseph (CJ-9442)
757 Third Avenue, 25th Floor
New York, NY 10017
(212) 688-5640
Fax (212) 688-2548

*Attorneys for Plaintiff*